Martin A Muckleroy, Esq.
Nevada Bar No. 9634
Dustin A. Johnson, Esq.
Nevada Bar. No. 9306
**MUCKLEROY JOHNSON**
6767 W. Tropicana Avenue, Suite 106
Las Vegas, Nevada 89103
Telephone: (702) 248-1065
martin@muckleroyjohnson.com
dustin@muckleroyjohnson.com

*Attorneys for Plaintiff*

*(Additional counsel listed on signature page)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| STEFAN MUENCHHAGEN, Derivatively on Behalf of SPECTRUM PHARMACEUTICALS, INC., | |
| Plaintiff, | Case No. |
| v. | |
| RAJESH C. SHROTRIYA, LUIGI LENAZ, GILLES GAGNON, ANTON GUETH, STUART M. KRASSNER, ANTHONY E. MAIDA, KRISHAN K. ARORA, BRETT L. SCOTT, AND JOSEPH KENNETH, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** **(JURY TRIAL DEMANDED)** |
| Defendants, | |
| and | |
| SPECTRUM PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

Plaintiff Stefan Muenchhagen ("Plaintiff"), by his attorneys, alleges for his complaint against defendants upon personal knowledge as to himself and his own acts and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through his attorneys, as follows:

## I.  INTRODUCTION

1.     This is a shareholder derivative action brought on behalf of Nominal Defendant Spectrum Pharmaceuticals, Inc. ("Spectrum" or the "Company") against certain current and former officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. The relevant period is August 8, 2012 through the present (the "Relevant Period").

2.     Spectrum is a biotechnology company with integrated commercial and drug development operations with a focus on hematology and oncology. In the United States, Spectrum primarily markets two oncology drugs, FUSILEV® (levoleucovorin) ("FUSILEV") and ZEVALIN®.   FUSILEV is a folate analog used for the treatment of patients with advanced metastatic colorectal cancer.  In 2011 FUSILEV accounted for $153.1 million of Spectrum's $193 million in total revenues.  In 2012 it accounted for $204.3 million of Spectrum's $267.7 million in total revenues.

3.     The Individual Defendants (as defined below) breached their fiduciary duties owed to Spectrum and its shareholders by disseminating false and misleading statements to the investing public in connection with FUSILEV and concealed the impact that the increased availability of a competing generic drug (leucovorin) would have on future sales of FUSILEV.

4.     On March 12, 2013, after the market closed, the Individual Defendants caused the Company to issue a press release providing its full-year revenue outlook.  The Company reported that 2013 sales of FUSILEV, the Company's primary and most important revenue-generating drug, would be dropping significantly due to anticipated changes in ordering patterns for FUSILEV, due in part to the recent stabilization of the folate analog market.  The Company forecasted full-year

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2013 revenues in the range of $160 to $180 million, over $100 million lower than analysts' revenue expectations of $297 million for 2013.  The press release stated in relevant part:

> Based upon recent communications with customers, Spectrum Pharmaceuticals anticipates a change in ordering patterns of FUSILEV® following the recent stabilization of the folate analog market. The Company now expects that FUSILEV sales will be approximately $10 to $15 million for the first quarter of the year, and approximately $80 to $90 million for the 2013 fiscal year. The Company noted that, while hospital sales are shifting to generics, the end-user demand for FUSILEV remains stable in the clinics, and the Company continues to anticipate solid demand in this segment in 2013.

5.      The reality, which was known to the Individual Defendants, but concealed from the investing public was as follows:

    a)      once the availability of leucovorin, a generic folate analog, increased, Spectrum's sales of FUSILEV would plummet;

    b)      the purported advantages of FUSILEV over leucovorin would not be sufficient for clinics and hospitals to continue to opt for the more expensive FUSILEV once leucovorin was available in larger quantities; and

    c)      the Individual Defendants lacked a reasonable basis for their overwhelmingly positive statements about the Company and its revenue and earnings.

6.      The Individual Defendants' conduct was extremely reckless, and has resulted in substantial damages to Spectrum and its stockholders.  The Individual Defendants have exposed the Company to civil liability as a result of a number of securities fraud class action lawsuits (the "Securities Class Action") pending against the Company and certain of its senior executive officers.  In addition, on April 1, 2013, the Company received a subpoena from the Securities and Exchange Commission ("SEC") for documents in connection with the charge in ordering patterns for FUSILEV.  Moreover, the Company's reputation and goodwill in the securities markets has been severely damaged, thereby hampering the Company's ability to secure future business partners and financing. Finally, certain of the Individual Defendants have been unjustly enriched because

they sold Spectrum stock at artificially inflated prices while in possession of nonpublic adverse information concerning the Company's future sales of FUSILEV.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

8.      This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

9.      Venue is proper in this District pursuant to U.S.C. §1391(a) because a substantial portion of transactions and wrongs complained of herein occurred in this District.   Further, Defendants participated in board of director meetings or maintain executive offices in this District and have received substantial compensation in this District by engaging in numerous activities and conducting business in this District.   Further, Spectrum maintains its principal place of business in this District.

## III.     PARTIES

10.      Plaintiff Stefan Muenchhagen is a current shareholder of Spectrum and has continuously held Spectrum stock during the relevant period and through the present.   Plaintiff is a citizen of Australia.

11.      Nominal Defendant Spectrum is a biotechnology company with integrated commercial and drug development operations with a focus on hematology and oncology. Spectrum is incorporated in the State of Delaware and headquartered in Henderson, Nevada.

12.      Defendant Rajesh C. Shrotriya ("Shrotriya") has served as the Chairman of Spectrum's Board, Chief Executive Officer and President since August 2002.   From September 2000 to August 2002, Shrotriya served as President and Chief Operating Officer of Spectrum, and has been a director of Spectrum since 2001.   Shrotriya also serves as a member of the board of directors of Antares Pharma, Inc. ("Antares").   Shrotriya joined the Antares' board in April 2004 and has been a member of its Compensation and Governance and Nominating Committees since

2007. Prior to joining Spectrum, Shrotriya served as Executive Vice President and Chief Scientific Officer of SuperGen, Inc. ("SuperGen") from November 1996 until August 2000, and as its Senior Vice President and Special Assistant to the President from November 1996 until May 1997. In addition, for 18 years, Shrotriya held various positions at Bristol-Myers Squibb Company ("Bristol-Myers Squibb"), the most recent being Executive Director Worldwide CNS Clinical Research. Shrotriya sold 735,993 shares of his personally held Spectrum common stock for proceeds of nearly $8.8 million with inside information regarding the imminent decline in FUSILEV sales. This was in addition to total compensation for 2011 and 2012 of $25.2 million and $10.1 million, respectively. According to Spectrum's SEC filings, Shrotriya is not considered under the listing standards of the NASDAQ Global Market and rules promulgated by the SEC to be an independent director. Upon information and belief, Shrotriya is a citizen of California.

13.     Defendant Luigi Lenaz ("Lenaz") has been a director of Spectrum since June 2010. Lenaz served as Spectrum's Chief Scientific Officer from February 2005 to June 2008 and as President of Spectrum's Oncology Division from 2000 to 2005. In addition, Lenaz provided consulting services to Spectrum from June 2008 to June 2010. From 1997 to 2000, Lenaz served as Senior Vice President of Clinical Research, Medical Affairs at SuperGen. In addition, from 1978 to 1997, Lenaz held several senior management positions with Bristol-Myers Squibb, including Senior Vice President of Oncology Franchise Management from 1990 to 1997 and Director of Scientific Affairs, Anti-Cancer from 1985 to 1990. According to Spectrum's SEC filings, Lenaz is not considered under the listing standards of the NASDAQ Global Market and rules promulgated by the SEC to be an independent director. Upon information and belief, Lenaz is a citizen of Pennsylvania.

14.     Defendant Gilles Gagnon ("Gagnon") has served on the Company's Board since March 27, 2012. Gagnon is currently President of Spectrum Pharma Canada Inc., an affiliate of Spectrum, and has served in such position since September 2008. According to Spectrum's SEC filings, Gagnon also is not considered, under the listing standards of the NASDAQ Global Market

and rules promulgated by the SEC, to be an independent director.    Upon information and belief, Gagnon is a citizen of California.

15.    Defendant Anton Gueth ("Gueth") has served as a Director of Spectrum since March 27, 2012.   Gueth serves as a member of the Company's Audit and Nominating and Governance Committees.   Gueth also serves on the board of directors of Antares, along with Defendant Shrotriya.   Gueth joined Antares' board in October 2003 and has served on its Audit Compensation and Governance and Nominating Committees.    The last two with Defendant Shrotriya.  Upon information and belief, Gueth is a citizen of California.

16.    Defendant Stuart M. Krassner ("Krassner") has served as a director of Spectrum since December 2004 and was previously a member of its Scientific Advisory Board from 1996 to 2001. Krassner serves as a member of the Company's Audit and Nominating and Governance Committees and Chairman of the Compensation Committee. Upon information and belief, Krassner is a citizen of California.

17.    Defendant Anthony E. Maida ("Maida") has served as a Director of Spectrum since December 2003.  During the Relevant Period, Maida sold 30,000 shares of his personally held Spectrum stock for proceeds of approximately $408,399 with inside information regarding the imminent decline of FUSILEV sales.  Maida serves as a member of the Company's Compensation Committee and the Chairman of the Audit and Nominating and Governance Committees. Upon information and belief, Maida is a citizen of California.

18.    Defendant Krishan K. Arora ("Arora") has served as a director of Spectrum since June 2010.  Prior to his election as a director of Spectrum, Arora had been providing consulting services to Spectrum. Arora serves as a member of the Company's Audit, Nominating and Governance and Compensation Committees. Upon information and belief, Arora is a citizen of New Jersey.

19.    Defendant Brett L. Scott ("Scott") is, and at all relevant times was, the Company's Acting Chief Financial Officer ("CFO") and Senior Vice President. Scott sold 6,000 shares of his personally held Spectrum stock for proceeds of $72,000 with inside information regarding the

imminent decline of FUSILEV sales. Scott was also compensated in excess of $1.5 million for 2011 and received a cash bonus in fiscal 2012 for $50,000, and 25,000 stock options all based on Company performance which was due to market conditions and not actual improved performance. Upon information and belief, Scott is a citizen of California.

20. Defendant Joseph Kenneth Keller ("Keller") is, and at all relevant times was, the Company's Chief Operating Officer ("COO") and Executive Vice President. Keller received a cash bonus of $213,000 in fiscal 2012, as well as 120 restricted shares and 300,000 stock options, all based on Company performance which was due to market conditions and not actual improved performance. Upon information and belief, Keller is a citizen of California.

21. Defendants Shrotriya, Lenaz, Gagnon, Gueth, Krassner, Maida, Arora, Scott and Keller are collectively referred to herein as the "Individual Defendants."

## IV.   DEFENDANTS' DUTIES

22. By reason of their positions as officers, directors and/or fiduciaries of Spectrum and because of their ability to control the business and corporate affairs of Spectrum, the Individual Defendants owed Spectrum and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Spectrum in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Spectrum and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

23. Each director and officer of the Company owes to Spectrum and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Spectrum, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial and directorial positions with Spectrum, each of the Individual Defendants had access

to adverse non-public information about the financial condition, operations, and improper practices of Spectrum.

25.     To discharge their duties, the officers and directors of Spectrum were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Spectrum were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Spectrum conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

26.     In addition to these duties, the members of Spectrum's Audit Committee had additional duties as set forth in the Audit Committee Charter.

27.     Spectrum's Audit Committee Charter specifies that the Audit Committee is charged with responsibility for overseeing and monitoring the "accounting and financial reporting processes of the Company," as well as "the integrity of the Company's financial statements" and "the Company's compliance with legal and regulatory requirements."

28.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Spectrum, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the relevant period have been ratified by the remaining Individual Defendants who collectively comprised a majority of Spectrum's Board.

29.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results, and prospects as detailed herein, by failing to properly oversee the Company's business and operations, and by failing to prevent the Individual Defendants from taking such illegal actions.

## V.     FACTUAL BACKGROUND

30.     Spectrum is a small biotechnology company with integrated commercial and drug development operations with a focus on hematology and oncology.  According to Bloomberg Businessweek, as of February 28, 2013, Spectrum had only 193 employees.  The Company's principal product is an oncology drug named FUSILEV.

31.     FUSILEV is a folate analog formulation and the pharmacologically active isomer (the levo-isomer) of the racemic compound, levoleucovorin.  FUSILEV rescue is indicated after high-dose methotrexate therapy in patients with osteosarcoma.

32.     The Company commercially launched FUSILEV in August 2008 and recorded product sales, net in the accompanying statements of operations of approximately $204.3 million, $153.5 million, and $32.0 million from FUSILEV sales for the years ended December 31, 2012, 2011 and 2010, respectively.

33.     The key competitive formulation to FUSILEV is the generic drug, leucovorin. Leucovorin is produced by Bedford Laboratories, Sagent Pharmaceutical ("Sagent"), Teva Pharmaceuticals ("Teva") and APP Pharmaceuticals.

34.     2008 and 2009 saw a decline in leucovorin supplies.  According to the American Society of Health-System Pharmacists ("ASHP"), an organization that monitors drug shortages, the leucovorin shortage was because Teva had a leucovorin shortage due to manufacturing delays, APP and Sagent were short on leucovorin due to increased demand, and Bedford Laboratories stopped production.

35.     These shortages of leucovorin, which were the subject of Food and Drug Administration ("FDA") alerts, represented a huge opportunity for Spectrum, as it was able to increase its sales of FUSILEV.  Sales rapidly increased, with revenues for 2010 up 160% over 2009.  However, in 2012, the availability of leucovorin grew and with it, a down turn in the sales of FUSILEV grew increasingly imminent.  Individual Defendants continually dismissed and ignored such concerns, claiming sales of FUSILEV would not be adversely affected by increased supplies of leucovorin.

36.     On December 9, 2011, the Individual Defendants caused the Company to issue a press release entitled "Spectrum Pharmaceuticals Affirms Strong Patent Protection for FUSILEV® (levoleucovorin) Through December 31, 2019," which stated in relevant part:

> Spectrum Pharmaceuticals, a biotechnology company with fully integrated commercial and drug development operations with a primary focus in hematology and oncology, affirmed today that the U.S. Food & Drug Administration (FDA) has granted FUSILEV® (levoleucovorin) "Orphan Drug" exclusivity for use in combination chemotherapy with 5-fluorouracil in the palliative treatment of patients with advanced metastatic colorectal cancer. In addition, FUSILEV therapeutic compositions are protected under a US Patent which expires at the end of December 2019. This is a composition of matter patent claiming a therapeutically effective amount of purified levoleucovorin. The Company has already filed a patent extension application.  "We are aware that a company has filed an Abbreviated New Drug Application for the generic version of FUSILEV," said Rajesh C. Shrotriya, MD., Chairman, Chief Executive Officer, and President of Spectrum Pharmaceuticals. "While we recognize that such filings are not unusual given that FUSILEV has reached significant revenue milestones, we are confident that our exclusivity position is strong. Our Orphan Drug exclusivity protects FUSILEV from generic levoleucovorin competition for the next seven years. In addition, we believe our intellectual property protecting FUSILEV is strong and we plan to vigorously defend it to the full extent of the law."

37.     On August 8, 2012, the Individual Defendants caused the Company to issue a press release announcing its second quarter 2012 financial results. The Company reported net income of $18.1 million, or $0.29 diluted earnings per share ("EPS"), and revenue of $68.7 million for the quarter ending June 30, 2012. Additionally, the Company reported record FUSILEV revenue of $56.6 million. The press release stated in part:

"The second quarter was a historic period for Spectrum, during which we had record revenues and strong profits," said Rajesh C. Shrotriya, MD, Chairman, Chief Executive Officer, and President of Spectrum Pharmaceuticals. "These are exciting times at Spectrum, and we expect several key catalysts before the end of the year. Based on our current product portfolio, strong financial position, robust pipeline and active business development, we are in a formidable position to further grow our company over the next 5 years.

38.     After releasing its second quarter 2012 financial results on August 8, 2012, Defendant Shrotriya, on behalf of Spectrum, hosted a conference call with analysts, investors and media representatives.  Defendant Scott was also present on the call during which Defendant Shrotriya represented:

[ANALYST:] Raj, I think one of the other questions linked to FUSILEV, just pick up where Joe Pantginis left off is, that there's a common perception that once the generic leucovorin shortage is alleviated, that basically you guys are toast. And so what I'd like to hear from you is number one, what's your understanding about the recent developments in the leucovorin shortage? And number two, assuming that at some point in the future the generic leucovorin does make it back to the marketplace, how does Spectrum continue to gain further share against generic equivalent?

[SHROTRIYA:] Mike, that's a very good question. First thing let me say that it's a pity that, that question keeps coming up for the last seven or eight quarters. I've heard that the dating for approval on April 28 last year, when we got approval, somebody put out a blog saying that this drug is going to be - Spectrum is going to go down the hill and we lost a huge market cap on that day, on a day when we got approval for FUSILEV.

Quarter after quarter, around our earnings release there are some blogs [that] appear and misinformation appears. And that has absolutely no basis. That information appears with trying to manipulate our stock or some malicious intent. In fact, numbers speak for themselves. I think people have to understand that FUSILEV is not leucovorin generic, which is a mixture of 50% biologically inactive dextro form and 50% levo form. That drug has been around for 60 years.

In Europe, there is no shortage of generic leucovorin. And still the sales of FUSILEV or levoleucovorin in Europe and Japan ex-US are close to between $150 million, $200 million a year. And this drug has been available for over 15 years ex-US. So we believe, not only the fact that FUSILEV got approval in 2011 as compared to generic leucovorin approval of 1952, the fact that ZEVALIN has a unique genocode should clearly tell people who are educated enough to understand the marketing and selling of oncology drugs, that it is differentiated product and it has nothing to do with generic leucovorin. That's number one.

Number two, generic companies come in and out of market. The shortage of generic leucovorin, why is it shortage generic leucovorin? There are many companies that make it. They will compete with each other. There are companies that will get approval, more companies will get generic approval. In fact, as generic leucovorin supplies increase in the marketplace, so in other words, the shortage is abating, FUSILEV sales are continuing to grow. So the penetration and traction of FUSILEV is sustainable. And I believe the generic companies will compete with themselves, not with FUSILEV.

39.     Immediately after this news, Defendant Shrotriya began selling his shares of Spectrum stock, selling $2.6 million worth of Spectrum stock in mid-August 2012.

40.     On November 7, 2012, Defendants caused the Company to issue a press release announcing third quarter 2012 financial results. The Company reported net income of $21.3 million, or $0.33 diluted EPS, and revenue of $69 million for the quarter ending September 30, 2012.  Additionally, the Company reported expectations of pro-forma revenue to exceed $300 million in 2012, up from previous guidance of around $300 million. The press release stated in relevant part:

"The third quarter marks the eighth consecutive profitable quarter that has helped Spectrum establish a great foundation and platform to attain additional growth," said Rajesh C. Shrotriya, M.D., Chairman, President and Chief Executive Officer of Spectrum Pharmaceuticals, Inc. "Diversification is key to our strategy, and we took a major step in that direction by completing the acquisition of Alios in September and adding a third product, FOLOTYN, to our portfolio. Four years ago we were primarily a FUSILEV company with limited cash. Today, Spectrum has FUSILEV, worldwide ZEVALIN, and FOLOTYN, along with a robust, maturing pipeline, and a strong balance sheet."

41.     After releasing its third quarter 2012 financial results on November 7, 2012, Defendants Keller, Shrotriya and Scott, on behalf of Spectrum, hosted a conference call with analysts, investors and media representatives, during which they represented the following:

[KELLER:] The second area I want to cover today is the progress we made in building and refitting our commercial organization to accelerate the growth of our three marketed oncology drugs. We are starting this process from a solid foundation. Because of changes in buying patterns, there can be some fluctuation in FUSILEV sales, as we saw this quarter. Importantly, FUSILEV demand remains strong despite readily-available supplies of generic leucovorin. Market research shows that 75% of physicians say that generic leucovorin is available without difficulty. It is clear that physicians are continuing to choose FUSILEV even when other options are available. This quarter there was a 13% increase in the number of accounts ordering FUSILEV. When we look at market penetration over the past 12 months, FUSILEV penetration is up from 29% in the last quarter to 31% in this quarter, and we believe there is room for improvement.

[SHROTRIYA:] I'm looking for a day when the market is over-flooded with all generic Leucovorin supplies and they fight with each other and kill each other and Spectrum's FUSILEV will keep performing on its growth trajectory that it has been doing in the past. And all the naysayers, all the people who believe that somehow FUSILEV sales are going to go fall off the cliff, we have proven them wrong for eight quarters and you must take my word for it. We have proved it forever.

42. On November 15, 2012, Defendant Shrotriya, on behalf of Spectrum, attended a Credit Suisse Group AG Healthcare Conference with analysts, investors and media representatives, during which he represented the following:

As you will see, our FUSILEV sales have been growing consistently quarter after quarter. The reason for that is that we have more clinics, more clinicians, and more physicians ordering FUSILEV quarter after quarter. In fact, our estimate is that in last quarter 31% penetration has occurred of our drug and there are more accounts ordering. Repeated orders are coming for FUSILEV.

We have a dedicated sales force that promotes FUSILEV. In fact, a big thing now all of our sales force, combined sales force of Alios Therapeutics and combined sales force of Spectrum Pharmaceuticals, they both will now together promote FUSILEV. Every sales rep in the Spectrum while [sic] now promote all three drugs- FUSILEV, ZEVALIN, and Folotyn.

43. On December 12, 2012, Defendant Shrotriya, on behalf of Spectrum, attended an Oppenheimer Holdings Inc. Healthcare Conference with analysts, investors and media representatives, during which he represented the following:

13

[SHROTRIYA:] Let me talk briefly about FUSILEV. FUSILEV is a differentiated, only branded folate analog that is approved for metastatic colorectal cancer. Colorectal cancer is the third-most frequently diagnosed cancer in men and women, and it is the second-leading cause of cancer death in men and women in the United States.

And as you will see, this latest study that was published in JCO that shows in a head-to-head comparison against generic leucovorin, which is a mixture of dextro form and levo form, a 50-50 mixture, it shows that the patients on FUSILEV live longer and, in fact, they had less side effects. It is statistically significant, less side effects.

\* \* \*

[AUDIENCE MEMBER:] I was curious about pricing and pricing discounts. Are you being forced to offer discounts to larger groups?

[SHROTRIYA:] We do not give any special discounts. Whatever discounting is practiced in the health industry, that's all we do.

For example, one of the ways you can judge us, the way the average sales price is. If the company discounts, that adversely affects the average sales price of the drug. Our FUSILEV sales price, for example, has been going up. The average sales price of FUSILEV has grown from $160 per vial to $190 per vial over the three quarters. So, therefore, you can see that it has not adversely affected the ASP. This Company would go out and give huge discounts to anybody, then it will erode the average sales price.

44.     Following these statements, Shrotriya sold $4.2 million worth of his Spectrum stock at the end of December 2012.

45.     On February 21, 2013, Defendants caused the Company to issue a press release announcing its fourth quarter and full-year 2012 financial results. The Company reported net income of $8.6 million, or $0.13 diluted EPS, and revenue of $70.1 million for the fourth quarter ended December 31, 2012. Additionally, the Company reported net income of $94.5 million, or $1.46 diluted EPS, and revenue of $267.7 million for the period ended December 31, 2012. FUSILEV sales for the year were $204.3 million. Additionally, the press release noted that continuing to gain FUSILEV market share, grow revenue, and initiate additional clinical studies to expand indications were "key catalysts" for 2013. The press release stated in relevant part:

"With substantial year-over-year sales growth, 2012 stands out as a transformational year for Spectrum and provides a solid platform for anticipated strong growth in sales and operating income in 2013," stated Rajesh C. Shrotriya,

M.D., Chairman, President and Chief Executive Officer of Spectrum Pharmaceuticals, Inc. "FUSILEV® sales volume was up in the fourth quarter in a competitive environment. We also diversified our commercial portfolio through the addition of FOLOTYN® last fall, and FOLOTYN demonstrated robust sales in the most recent quarter. As we enhanced our global footprint and increased our commercial and market penetration, we also expanded our senior commercial team and implemented a new structure to allow our sales force to be even more customer-facing."

46.     After releasing its fourth quarter and full-year 2012 financial results on February 21, 2013, Defendants Shrotriya and Keller, on behalf of Spectrum, hosted a conference call with analysts, investors and media representatives, during which defendants represented the following:

[SHROTRIYA:] We are very excited about the outlook for the Company. Last year, FUSILEV grew 56% in unit volume and 33% in dollar sales. FUSILEV demand remains strong, and we continue to see opportunities to expand its use.

* * *

[KELLER:] In the second half of 2012, our FUSILEV business shifted more towards accounts qualified for government pricing especially 340B purchasing. While in 2012, FUSILEV unit sales increased approximately 56% over 2011, government rebates inclusive of 340B charge backs increased approximately tenfold from $3.8 million in 2011 to $47.3 million in 2012. Our market research shows that this shift is largely complete, and going forward, we expect stable demand in this segment. Currently, approximately 75% of total FUSILEV business resides in the clinic segment. This creates a very strong base of FUSILEV business on which we can build upon and focus our promotional efforts against.

To reinforce this, I'm pleased to share with you that the number of clinics purchasing FUSILEV continues to grow and end-user demand year-to-date in 2013 is higher than in December of 2012. We expect this trend to continue throughout 2013.

* * *

So when we look at FUSILEV business right now, what we see is end-user demand, customer generated demand is very, very stable right now. In fact, when you look at the first few weeks of this year, and we have data all the way through January, the demand is actually higher than it was in December. So we feel that the underlying demand is very stable. Net purchasing patterns do change, but the underlying demand is very, very solid.

The second point I think that will help to clarify it is today, 75% of FUSILEV business is in the clinic setting. That is a setting that is very, very sticky for FUSILEV. Once accounts are using this product, it is very rare rarely do they go back to generic Leucovorin. So that gives us a nice place to build upon and really

use our new commercial organization to drive and grow the business in that segment from where we are right now.

47.    On March 12, 2013, Spectrum's stock closed at $12.43 per share. After the market closed, Defendants caused the Company to issue a press release providing its full-year revenue outlook.   The Company reported that sales of FUSILEV, the Company's greatest revenue-generating drug, would be dropping significantly due to anticipated changes in ordering patterns for FUSILEV, due in part to the recent stabilization of the folate analog market.   The Company reported sales will be approximately $10 to $15 million for the first quarter of 2013, and approximately $80 to $90 million for the fiscal year 2013.   Additionally, the Company forecast full-year 2013 revenues in the range of $160 to $180 million, much lower than analysts' revenue expectations of $297.33 million for 2013.   The press release stated in relevant part:

> Based upon recent communications with customers, Spectrum Pharmaceuticals anticipates a change in ordering patterns of FUSILEV® following the recent stabilization of the folate analog market. The Company now expects that FUSILEV sales will be approximately $10 to $15 million for the first quarter of the year, and approximately $80 to $90 million for the 2013 fiscal year.   The Company noted that, while hospital sales are shifting to generics, the end-user demand for FUSILEV remains stable in the clinics, and the Company continues to anticipate solid demand in this segment in 2013. The Company believes the majority of the impact from the change in ordering patterns will be reflected in the first half of 2013 and expects to return to a run-rate that more closely aligns with end-user demand by the end of the year.

48.    On this news, Spectrum's stock plummeted $4.64 per share to close at $7.79 per share on March 13, 2013, a one-day decline of 37% on volume of 22.5 million shares, 28 times Spectrum's average trading volume.

49.    A March 13, 2013 article posted on the investment website Motley Fool entitled "Spectrum Pharmaceuticals: When Being "Long" Backfires!" provided the following additional details in relevant part:

**Longs Notice Problems, When it's Too Late**

16

This is a company where sales of its best-selling drug FUSILEV were obviously under pressure from generics, and despite the company's denials, it was just as clear that discounting was being used as a tactic to maintain sales stability.

According to Thomson Financial, there were 14 insider transactions in the last six months, with 13 being insiders dumping their shares. These insiders sold 767,743 shares and most were from the company's CEO Rajesh Shrotriya. For the last several months, investors such as myself have defended his actions with excuses such as "it was a preplanned sale" and "he's 68 years old and probably near retirement," but the truth is, when a CEO dumps shares to this degree, in a stock that looks to be clearly undervalued, there is probably a bigger problem in the works.

**When the Rumored Problems Come to Surface**

So what was it that created an afterhour loss of 40%? Obviously, it was regarding sales guidance for FUSILEV. However, it wasn't just weak guidance; it was guidance that could not have been mistaken. There was no way that the company did not see this coming. For example, the company saw sales of $44.6 million and $204 million for FUSILEV in Q4 and for 2012. Now, the company is expecting sales of just $10 million-$15 million in Q1 and $80 million-$90 million for 2013. Personally, this is the largest and most significant change in direction that I have ever seen in the 15 years that I have been a retail investor, and covering my own investments and the space.

What makes this pill even tougher to swallow is that just a few weeks ago management was saying that there would be sales growth in 2013. Therefore, how could the tide change so fast? How did they not see this coming? In my opinion, there are no reasonable answers to these questions, but rest assure, the SEC, analysts, and countless attorneys will find out. At first glance there looks to be various signs of fraud, misrepresentation, and misleading guidance on behalf of the company. Therefore, although it hurts to admit when you're wrong, sometimes it's better to admit the obvious, and live to fight another day.

**With a 40% Loss Why Shouldn't I Buy?**

There will be many who look at the performance and the guidance issued by Spectrum and believe that it presents opportunity, and it's very possible that these people could be right. However, at this point, it's not an issue of valuation, but rather trust, and trust in management. Once a company loses the trust of investors it is quite difficult to regain. There's no overnight solution.

Consider the fact that Spectrum now expects total revenue of $160 million-$180 million for 2013; therefore with a 40% loss it's trading with a future price/sales of about $2.60. In my opinion, this is too expensive for a company that just slashed full-year sales for its best-selling drug by 60%, and much of this guidance is based

on the company's guidance that sales of Folotyn and Zevalin will rise in 2013. However, can we trust the company with this guidance? My answer is no, not until proven otherwise.

**Conclusion**

Already, I have received emails and tweets with people comparing this situation to that of **Questcor Pharmaceuticals** (NASDAQ: QCOR). Questcor saw a decline from $51 to $20 following bearish research, a regulatory investigation into business practices, and insurance restrictions that will affect sales by less than 10%. Spectrum's is far worse because it was sudden, after months of denial from management. Questcor is still growing by 100% year-over-year and faces far less questions than Spectrum.

50.     The true facts, which were known by the Individual Defendants but concealed from the investing public were as follows:

a)      once the availability of leucovorin increased, Spectrum's sales of FUSILEV would plummet; and

b)      the purported advantages of FUSILEV over leucovorin would not be sufficient for clinics and hospitals to continue to opt for the more expensive FUSILEV once leucovorin was available in larger quantities.

51.     As a result of Defendants' false statements, Spectrum stock traded at artificially inflated levels. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down 40% from their high. The Company's market capitalization fell from $740.08 million on March 12 to $463.82 million over the next few days. Not surprisingly, multiple securities class actions lawsuits have been filed against the Company and Defendants Shrotriya, Scott and Keller for alleged violations of federal securities laws.

**VI.     THE INDIVIDUAL DEFENDANTS DAMAGED THE COMPANY**

52.     The false financial guidance at Spectrum and the Individual Defendants decision to mislead shareholders regarding future sales of FUSILEV have damaged, and will continue to, the Company.  According to the Company's SEC filings, On April 1, 2013, the Company received a subpoena from the SEC for documents pursuant to a formal order of investigation.  The subpoena followed the Company's March 12, 2013 announcement that it anticipated a change in ordering patterns of FUSILEV.  The Company is cooperating with the SEC investigation.  The Company cannot predict when the SEC will conclude its investigation or the outcome of the investigation.

53.     The Company has also been exposed to substantial defense costs and expense (and potential liability) arising out of the Class Action filed in federal court in Nevada by purchasers of the Company's securities during the financial reporting periods for which the Company's projections and results were false.  The initial complaints in that action allege that Spectrum and defendants Shrotriya, Scott and Keller acted with scienter or intent to defraud investors, by issuing inflated financial projections and false financial results.

54.     In addition, the inflated financial projections and ensuing SEC investigations have caused substantial damage to the Company's reputation in the financial markets.  This is evidenced in part by the decline in the Company's share price following revelations that the Company's financial projections were bogus, its financial statements contained errors, and the Company's internal controls were deficient.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS FOR THE BOARD OF SPECTRUM

55.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

56.     Plaintiff will fairly and adequately protect the interests of Spectrum and its shareholders in enforcing the rights of Spectrum against the Individual Defendants.  Plaintiff's

attorneys are experienced in this type of litigation and will prosecute this action diligently on behalf of Spectrum.  Plaintiff has no interests adverse to Spectrum.

57.     As a result of the facts set forth herein, Plaintiff has not made a demand on the Spectrum Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

58.     Defendants who are currently the members of the Spectrum's Board are Defendants Shrotriya, Lenaz, Gagnon, Gueth, Krassner, Maida and Arora (the "Director Defendants").

59.     The Director Defendants face a substantial likelihood of liability in this action because they knew or should have known that they caused or allowed Spectrum to repeatedly issue false and misleading statements concerning the prospects of Spectrum's core product FUSILEV. Because of their advisory, executive, managerial, and directorial positions with Spectrum, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels. The Board is obligated to be informed about the Company and the Board has full and unrestricted access to any relevant records of the Company.  FUSILEV is and was the Company's principal product.  In 2011 FUSILEV accounted for $153.1 million of Spectrum's $193 million in total revenues. In 2012 it accounted for $204.3 million of Spectrum's $267.7 million in total revenues.  Thus, the Company's officers and directors could not help but be well aware of all developments with respect to FUSILEV.  A fact given even more credence given the remarkably small size of the Company.

60.     In fact, at the March 20, 2013 25th Annual Roth Conference, Defendant Keller stated:

• The Company was "***losing business in the hospitals and that is not a surprise. That is what we that is what we thought would happen.***"

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

• *"The hospital market is a price-sensitive market, and as the supply of generic racemic leucovorin ebbs and flows when it is available, our business in the hospitals will decline."*

• *"We always believed that the hospital business would be the most sensitive business, and that business would decline when the availability of generic leucovorin got consistent, and that is what we are seeing. We are seeing the hospital business decline."*

**Defendants Shrotriya and Maida Have Profited Through Illegal Insider Trading**

61.     Just prior to the Company's public announcement of a precipitous decline in FUSILEV sales, Defendants Shrotriya and Maida sold millions of dollars worth of personally held Spectrum stock while in possession of the adverse non-public information concerning FUSILEV sales.

62.     From August 8, 2012 through March 12, 2013, Defendant Shrotriya sold 735,993 shares of Spectrum common stock for proceeds of nearly $8.8 million based on his possession of material, adverse, non-public "core operational" information regarding sales of FUSILEV. Interestingly, Defendant Shrotriya had not sold any of his shares of Spectrum common stock for a decade prior to beginning to dump his shares in August of 2012. After a decade of not selling any of his Spectrum shares, Shrotriya began unloading his shares in August 2012. Shrotriya announced that his sales were for "tax and estate planning purposes," but the timing and facts show otherwise. Demand upon Shrotriya is futile due to his receipt of material, personal financial benefits from challenged insider trading transactions which were not shared with other Spectrum shareholders.

63.     During the period of August 8, 2012 through March 12, 2013, Defendant Maida sold 30,000 shares of Spectrum common stock for proceeds of approximately $408,399 based on his possession of material, adverse, non-public "core operational" information regarding the sales of FUSILEV.  Demand upon Maida is futile due to his receipt of material, personal financial benefits from challenged insider trading transactions which were not shared with other Spectrum shareholders.

**The Members of the Board of Directors Lack Independence**

**Defendant Shrotriya Lacks Independence**

64.    Defendant Shrotriya serves as the Company's Chairman and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. For instance Shrotriya received compensation for 2011 and 2012 of $25.2 million and $10.1 million, respectively. Because of Shrotriya's employment with the Company he is not considered an independent director.  In fact, according to Spectrum's SEC filings, Shrotriya is not considered, under the listing standards of the NASDAQ Global Market and rules promulgated by the SEC, to be an independent director.  Thus, Defendant Shrotriya is incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendant Lenaz Lacks Independence from Shrotriya**

65.    Defendant Lenaz has worked with and served as a colleague and subordinate of Defendant Shrotriya for many years. Prior to joining Spectrum's Board in June 2010 Lenaz provided consulting services to Spectrum from June 2008 to June 2010.  In addition, Lenaz served under Shrotriya as Spectrum's Chief Scientific Officer from February 2005 to June 2008 and as President of Spectrum's Oncology Division from 2000 to 2005.  Prior to that Lenaz served as Senior Vice President of Clinical Research, Medical Affairs at SuperGen -- for which Shrotriya served as Executive Vice President and Chief Scientific Officer.  Even before that Lenaz and Shrotriya worked together at Bristol-Myers Squib. At the March 20, 2013 Roth Conference, Defendant Shrotriya remarked to analysts:

> "He [Lenaz] was in oncology division of Bristol Myers for 22 years. And he has followed me in every company I've worked for, SuperGen, and then Spectrum. When he retired from here, he became Scientific Advisor to the Company, and now he is on the Board of the Company."

66.    Moreover, according to Spectrum's SEC filings, Lenaz is not considered, under the listing standards of the NASDAQ Global Market and rules promulgated by the SEC, to be an

independent director.  For all of the above reasons, Defendant Lenaz is incapable of impartially considering a demand to commence and vigorously prosecute this action against Defendant Shrotriya.

**Defendant Gagnon Lacks Independence from Shrotriya**

67.    Gagnon is currently President of Spectrum Pharma Canada Inc., an affiliate of Spectrum, and has served in that position since September 2008.  Thus, Gagnon is beholden to Shrotriya for his employment. Moreover, according to Spectrum's SEC filings, Gagnon is not considered, under the listing standards of the NASDAQ Global Market and rules promulgated by the SEC, to be an independent director.  Thus, Defendant Gagnon is incapable of impartially considering a demand to commence and vigorously prosecute this action against Shrotriya.

**Defendant Gueth Lacks Independence from Shrotriya**

68.    Defendants Gueth and Shrotriya are longtime fellow directos on the board of directors of Antares.  Gueth joined the Antares' board in October 2003 and serves as chairman of its compensation committee and as a member of its audit committee and governance and nominating committee.  Shrotriya joined Antares' board in April 2004 and also serves as a member of its compensation committee and a member of its governance and nominating committee, along with Gueth.   Thus, Defendant Gueth is incapable of impartially considering a demand to commence and vigorously prosecute this action against Shrotriya.

**Defendant Krassner Lacks Independence from Shrotriya**

69.    Defendant Krassner is a longtime Director of Spectrum, having served as a Director of Spectrum since December 24, 2004.  He was previously a member of Spectrum's Scientific Advisory Board from 1996 to 2001. Thus, as a longtime colleague of Defendant Shrotriya, Defendant Krassner is incapable of impartially considering a demand to commence and vigorously prosecute this action against Shrotriya.

**Defendant Maida Lacks Independence from Shrotriya**

70.     Defendant Maida is also a longtime Director of Spectrum and colleague of Shrotriya, having served on Spectrum's Board since 2003. Thus, as a longtime colleague of Defendant Shrotriya, Defendant Maida is also incapable of impartially considering a demand to commence and vigorously prosecute this action against Shrotriya.

**Defendant Arora Lacks Independence from Shrotriya and Krassner**

71.     From February 2010 through at least June 2010, Defendant Arora provided consulting services to Spectrum.  Then, in June 2010, at the recommendation of Defendant Krassner, the Nominating and Corporate Governance Committee recommended, and Defendant Arora became, a member of the Spectrum Board.  Thus, Defendant Arora is incapable of impartially considering· a demand to commence and vigorously prosecute this action against Shrotriya or Krassner.

**Likelihood of Substantial Liability of the Audit Committee Defendants**

72.     Defendants Arora, Krassner, Maida and Gueth each serve on the Audit Committee. According to Spectrum's Audit Committee Charter the purpose of the Audit Committee is, among other things, to "oversee and monitor...[t]he Company's compliance with legal and regulatory requirements."

73.     The Audit Committee failed in these duties by failing to stop, and allowing the Company to continue, to disseminate false and misleading statements concerning the prospects of its most important product, FUSILEV, all while Defendants Shrotriya and Maida sold personally held Company shares ahead of the disclosure of bad news concerning FUSILEV sales. Given the importance of FUSILEV to the Company's financial performance, and the size of Spectrum, the Audit Committee in order to even remotely carry out its duties, would have been aware of all important developments related to FUSILEV, including the fact that once the availability of leucovorin increased, Spectrum's sales of FUSILEV would plummet.  Defendants Arora, Krassner,

Maida and Gueth breached their fiduciary duties of due care, loyalty, and good faith by failing to honestly inform Spectrum's shareholders and the investing public regarding the inevitable decline in FUSILEV sales.  Such conduct is not protected by the business judgment rule.

74.    As a result of the Audit Committee's failures, Defendants Arora, Krassner,  Maida and Gueth face a substantial likelihood of liability for breaches of fiduciary duties and making any demand upon them is futile.

**Additional Likelihood of Substantial Liability of the Compensation Committee Members**

75.    Defendants Arora, Krassner and Maida were at times relevant hereto members of the Board's Compensation Committee.  Pursuant to its Charter, the Compensation Committee is and was responsible for, among other things:

(a) reviewing and evaluating the Company's compensation arrangements; and

(b) determining compensation of CEO and executive officers (as defined by law).

76.    The Compensation Committee approved excessive compensation payments to senior executives, such as Defendants Shrotriya, Keller and Scott, based on financial performance that was based solely on market conditions and not actual improved performance and which the Compensation Committee and the Individual Defendants knew would be short-lived.  On the same basis, the Compensation Committee approved employment agreements, including Defendant Shrotriya's, based on misleading statements and grossly inflated financial results, and in the process, committed corporate waste.

77.    In addition, Defendants Arora, Krassner and Maida were members of the Compensation Committee when they agreed to award Defendant Shrotriya with extravagant compensation packages, including $25.2 million in compensation for 2011 and $10.1 million for 2012, based on market capitalization gains and financial results that were created by market forces and not actual performance.  As a result, the members of the Compensation Committee have

breached their fiduciary duties to the Company and are unable to independently consider a demand for derivative litigation against the Individual Defendants.  Moreover, these actions demonstrate the Compensation Committee's willingness to put the welfare of Defendant Shrotriya above the welfare of the Company and Spectrum's other shareholders.

**Additional Likelihood of Substantial Liability of the Board of Directors**

78.     FUSILEV is and was the Company's principal product.   In 2011 FUSILEV accounted for $153.1 million of Spectrum's $193 million in total revenues.  In 2012 it accounted for $204.3 million of Spectrum's $267.7 million in total revenues.  FUSILEV is admittedly the core indicator of the Company's business condition and the metric that the Company used to measure its current and future financial performance.   Accordingly, each of the Individual Defendants are assumed to have knowledge of the issues described herein related to FUSILEV and the fact that increases in the availability of leucovorin, which was predictable, would cause the Company's sales of FUSILEV to decline.  A fact given even more credence given the remarkably small size of the Company.

79.     The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise these wrongs from Spectrum shareholders and are therefore not disinterested parties for demand futility purposes.   Each of the Individual Defendants breached their fiduciary duties by knowingly disseminating false information regarding the future outlook of FUSILEV sales, which could not have been an exercise of good faith business judgment and amounted to extreme recklessness and bad faith.

**COUNT I**
**AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**
**FOR DISSEMINATING FALSE AND MISLEADING INFORMATION**

80.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

81.     As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Spectrum disseminated accurate, truthful and complete information to its shareholders.

82.     Individual Defendants violated their fiduciary duties of care, loyalty, candor and good faith by causing or allowing the Company to disseminate to Spectrum shareholders materially misleading and inaccurate information through public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

83.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**COUNT II**
**AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES**
**FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY**

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     Individual Defendants owed and owe Spectrum fiduciary obligations. By reason of their fiduciary relationships, Individual Defendants specifically owed and owe Spectrum the highest obligation of good faith, fair dealing, loyalty and due care.

86.     Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

87.     As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, Spectrum has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

88.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

89.     Plaintiff, on behalf of Spectrum, has no adequate remedy at law.

## COUNT III
## AGAINST DEFENDANTS SHROTRIYA, SCOTT, KELLER AND MAIDA FOR UNJUST ENRICHMENT

90.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91.     By their wrongful acts and omissions, Defendants Shrotriya, Scott, Keller and Maida were unjustly enriched at the expense of and to the detriment of Spectrum.

92.     Plaintiff, as a shareholder and representative of Spectrum, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT IV
## AGAINST ALL INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Spectrum, for which they are legally responsible. In particular, the Individual Defendants abused their positions of authority by causing or allowing Spectrum to misrepresent material facts regarding its business prospects of FUSILEV, the Company's key product.

95.     As a direct and proximate result of Individual Defendants' abuse of control, Spectrum has sustained significant damages.

96.     As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

97.     Plaintiff, on behalf of Spectrum, has no adequate remedy at law.

## COUNT V
## AGAINST ALL INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.     Individual Defendants had a duty to Spectrum and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Spectrum.

100.     Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Spectrum in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Individual Defendants breached their duties of due care, diligence and candor in the management and administration of Spectrum's affairs and in the use and preservation of Spectrum's assets.

101.     During the course of the discharge of their duties, Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Spectrum to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Spectrum, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged Spectrum.

## COUNT VI
## AGAINST ALL INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

102.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.   As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Spectrum to incur (and Spectrum may continue to incur) significant legal liability and/or legal costs to defend itself as a result of the Individual Defendants' unlawful actions.

104.   As a result of this waste of corporate assets, Individual Defendants are liable to the Company.

105.   Plaintiff, on behalf of Spectrum, has no adequate remedy at law.

## COUNT VII
### AGAINST DEFENDANTS SHROTRIYA, MAIDA AND SCOTT FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION

106.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

107.   At the time of the stock sales set forth herein, Defendants Shrotriya, Maida and Scott (the "Insider Selling Defendants") were in possession of material, adverse, non-public information described above, and sold Spectrum common stock on the basis of such information.

108.   The information described above was proprietary non-public information concerning the Company's future business prospects with respect to its core product, FUSILEV. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Spectrum common stock.

109.   At the time of their stock sales, the Insider Selling Defendants knew that the Company's forecasts were materially overstated and Spectrum's business prospects were much

bleaker than what was disclosed to the public; The Insider Selling Defendants' sales of Spectrum common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

110.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

111.     Plaintiff on behalf of Spectrum has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing Spectrum to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.     Awarding to Spectrum restitution from Defendants Shrotriya, Scott, Keller and Maida, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by those Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Dated:  May 28, 2013.

**MUCKLEROY JOHNSON**

By:  /s/ Martin A. Muckleroy
     Martin A. Muckleroy, Esq.
     Nevada Bar No. 9634
Dustin A. Johnson, Esq.
Nevada Bar No. 009306
6767 W. Tropicana Ave.
Suite 106
Las Vegas, Nevada 89103
Telephone: (702) 248-1065
Facsimile: (702)938-4065
martin@muckleroyjohnson.com


**FARUQI & FARUQI, LLP**
Michael J. Hynes, Esq.
Ligaya T. Hernandez, Esq.
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone:  (215) 277-5770
Facsimile:  (215) 277-5771
mhynes@faruqilaw.com
lernandez@faruqilaw.com

**FARUQI & FARUQI, LLP**
Beth A. Keller, Esq.
369 Lexington Avenue, 10th Floor
New York, New York 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

-and –

**ADEMI & O'RELLY, LLP**
Guri Ademi, Esq.
3620 East Layton Avenue
Cudahy, WI 53110
Telephone:  (414) 482-8000
Facsimile:  (414) 482-8001
gademi@ademilaw.com

***Attorneys for Plaintiff***

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT